UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------X

MONICA G. PERSAUD,

                    Plaintiff,

          -against-

ST. VINCENT'S SERVICES; ALLISON
NELSON, MANAGER; ADEBAYO
IYANDA, DIRECTOR; AND JANICE
ASHTON, MANAGING DIRECTOR,

                    Defendants.
-----------------------------------------------------X

**REPORT AND RECOMMENDATION**
**04 CV 4809 (SLT) (LB)**

**BLOOM, United States Magistrate Judge:**

Plaintiff brings this *pro se* action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e), *et seq.* ("Title VII"), the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621, *et seq.* ("ADEA"), and the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.* ("ADA"), alleging that defendants discriminated against her on the basis of her race, color, national origin, age and disability. Plaintiff alleges that defendants subjected her to disparate treatment, a hostile work environment, retaliation, and ultimately terminated her based on discrimination. Defendants move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.[1] The Honorable Sandra L. Townes referred this motion to me for a Report and Recommendation pursuant to 28 U.S.C. § 636(b). For the following reasons, it is respectfully recommended that defendants' motion for summary judgment should be granted.

---

[1] Defendants provided plaintiff with the requisite notice pursuant to Local Civil Rule 56.2.

## BACKGROUND

The following facts are not in dispute, unless otherwise noted. Plaintiff, Monica Persaud, a black 69 year-old woman of Guyanese descent, worked as a secretary to the resident director and facility staff in St. Vincent's Williamsburg Intermediate Care Facility (ICF) from February 10, 1995 until February 10, 2004. Plaintiff's responsibilities included typing, filing, telephone contacts, mail handling, photocopying and maintaining office supplies. Persaud Job Description attached to Defendants' Appendix of Exhibits as Exhibit J ("Job Description").

Plaintiff states that ICF management "did not appreciate my being there," would "try very hard to make my working life difficult because I am not Jamaican" and "would humiliate me most of the time and I was written up every month for frivolous reasons." Persaud Letter dated March 13, 2006 attached to Plaintiff's Affidavit in Opposition ("Persaud Letter") at 1. Plaintiff concedes that she would frequently arrive late to work, and attributes her lateness to her knee injury in 2000. Plantiff's Deposition Testimony attached to Defendants' Appendix of Exhibits as Exhibit B ("Pl. Dep.") at 124-126. However, plaintiff received disciplinary warnings about her lateness to work prior to 1999. See Performance Evaluations attached to Defendants' Appendix of Exhibits as Exhibit M ("Performance Evaluations"). For instance, plaintiff's April 20, 1998 evaluation stated that plaintiff "needs improvement in arriving to work in a timely fashion." Id. Her May 10, 1999 evaluation noted that plaintiff "needs to improve her punctuality or to arrive to work on time." Id.

Defendant Janice Ashton, who both hired and terminated plaintiff, warned plaintiff about her lateness. Affidavit of Janice Ashton ("Ashton Aff.") ¶ 12. Plaintiff's response to these warnings was "typically to argue and attempt to rationalize her tardiness as acceptable behavior." Id. Plaintiff never told Ashton that her ethnicity, color, age or disability had any bearing on her chronic lateness

or any other aspect of her employment. Id.

Plaintiff alleges that "others were late, too, and she [defendant Allison Nelson] didn't repeatedly warn them . . . [e]verybody was late . . . [a]nd they singled me out . . . [b]ecause I was not a favorite." Pl. Dep. at 122-124. Defendant Nelson, however, states that when "other employees were excessively late, I counseled them and disciplined them verbally or in writing if necessary, regardless of their age or ethnicity" yet "none of these employees refused my directives or argued with me" as plaintiff did. Affidavit of Allison Nelson ("Nelson Aff.") ¶ 8. Defendant Ashton also states that no other employee was late as frequently as plaintiff over a nine year period and that other employees of various ages and ethnic backgrounds had been disciplined for lateness. Ashton Aff. ¶ 15. Nelson warned Sandra Richards, a Jamaican employee who was frequently late to work, about her lateness but Richards, unlike plaintiff, ultimately improved her punctuality. Nelson Aff.¶ 9-10.

Plaintiff's latenesses grew more frequent and her behavior became increasingly insubordinate after Nelson's promotion to residence manager in 1999. Ashton Aff.¶ 19; see also Nelson Aff. ¶ 6. During Nelson's tenure as residence manager, from 1999 to 2004, Nelson wrote plaintiff various disciplinary memos for lateness and insubordination. Nelson Aff.¶ 19; Tardiness Warnings attached to Defendants' Appendix of Exhibits as Exhibit L ("Tardiness Warnings"); Insubordination Warnings attached to Defendants' Appendix of Exhibits as Exhibit R ("Insubordination Warnings"). Plaintiff was defiant in response to Nelson's requests that she arrive on time for work, she belittled Nelson's age and experience by calling her a "little girl," and "oftentimes refused to perform work" Nelson assigned to her. Nelson Aff. ¶ 12-13.

From 1999 to 2004, Nelson held numerous employee conferences with plaintiff to address plaintiff's rude behavior, lateness and refusal to follow directives. Employee Conference

3

Memoranda attached to Defendants' Appendix of Exhibits as Exhibit R ("Employee Conference Memoranda"). Nelson was not alone in disciplining plaintiff. In February 2002, defendant Adebayo Iyanda also warned and reprimanded plaintiff for her chronic lateness and insubordination. Iyanda Final Warning attached to Defendants' Appendix of Exhibits as Exhibit P ("Iyanda Final Warning").

On January 13, 2004, plaintiff argued with a co-worker because plaintiff was "annoyed at having to open the door for that individual." Nelson Aff. ¶ 16. This was not the first time plaintiff had confrontations with other staff. Id. Nelson also observed plaintiff sleeping at her desk during work hours and returning late from her lunch break on the same day. Id. ¶ 17. On January 27, 2004, Nelson issued plaintiff another disciplinary memorandum after plaintiff refused to perform accounting duties assigned to her. Insubordination Warnings. In January 2004, Nelson and Iyanda recommended that plaintiff should be terminated. Nelson Aff. ¶ 15; January 2004 Disciplinary Memoranda attached to Defendants' Appendix of Exhibits as Exhibit S ("January disciplinary memos"). Plaintiff was late to work nineteen times in the previous two-month period. Nelson Aff. ¶ 15. Ashton accepted Nelson's and Iyanda's recommendation to terminate plaintiff's employment as plaintiff's behavior had continued to deteriorate despite many warnings and opportunities to improve. Ashton Aff. ¶ 21.

On February 10, 2004, plaintiff met with Ashton, Iyanda, and Nelson to discuss her termination. Id. ¶ 22. Contrary to plaintiff's allegation, Ashton states that there was no mention of plaintiff's physical condition or impairment. Id. During the meeting, plaintiff refused to address her supervisor's criticism of her job performance. Id. She alleged that Nelson was responsible for all of plaintiff's problems and that Nelson had "set her up." Id. ¶ 23.

Plaintiff claims she was discriminated against because of her national origin ("Guyanese"),

race, age ("69"), color and disability ("knee problem and also a limp"). Plaintiff's Complaint ("Complaint") ¶¶ 7, 8. Plaintiff alleges a hostile work environment, stating that "the constant scrutiny made my life very unhappy." Id. ¶ 8. To support her claim that defendants' engaged in discrimination based on national origin, color, and race, plaintiff states that "Jamaicans were preferred as the Managing Director, the Manager as well as many others were all Jamaicans" and "from a staff of 15 persons, for the past four years about 20 persons were terminated and strangely, there were no Jamaicans terminated." Id.

Plaintiff claims that she was replaced by a younger employee of Jamaican origin, which supports her age and national origin discrimination claims. Persaud Letter at 1. She alleges "American staff who were hired by the Personnel Department being employed [sic] but eventually were terminated for some small reason and then after replaced by a Jamaican worker." Id. The employee who replaced plaintiff, Sophia Lyn, is of mixed Chinese and Jamaican ancestry. Ashton Aff. ¶ 24.

Plaintiff alleges that defendants discriminated against her based on her disability resulting from her knee injuries. Complaint ¶ 8. Plaintiff took medical leaves of absence in 2001 and again in August 2003. Nelson Aff. ¶ 21. After her knee injuries, plaintiff walked with a limp. Pl. Dep. at 108. She alleges that this limp caused her pain and made her late to work. Pl. Dep. at 129-131. Plaintiff also alleges that Nelson once mocked her limp. Id. at 131-132. Nelson denies that she ever mocked plaintiff. Nelson Aff. ¶ 21. Moreover, Nelson states that plaintiff never informed her that she was in need of an accommodation of any kind to perform any aspect of her job. Id. ¶ 22.

## PROCEDURAL HISTORY

Plaintiff filed a discrimination charge with the Equal Employment Opportunity Commission ("EEOC") on February 17, 2004.[2] Notice of Charge of Discrimination attached to Defendants' Appendix of Exhibits as Exhibit C. Plaintiff filed an identical discrimination charge with the New York City Commission on Human Rights ("NYCCHR") on April 27, 2004.[3] Verified Complaint attached to Defendants' Appendix of Exhibits as Exhibit E. The NYCCHR cross-filed plaintiff's complaint with the EEOC. The EEOC filed the City charge as a second, and different charge before realizing that plaintiff had previously filed a charge based on the identical allegations. On June 8, 2004, the NYCCHR dismissed plaintiff's charge because it contained the same underlying allegations as plaintiff's first EEOC charge. Notice of Administrative Closure attached to Defendants' Appendix of Exhibits as Exhibit F ("NYCCR Dismissal").

On June 23, 2004, the EEOC issued plaintiff a right-to-sue letter based on the charge filed on February 17, 2004. Dismissal and Notice of Rights as Ex. D. Plaintiff does not mention receiving this right-to-sue letter in her complaint. On August 10, 2004, the EEOC adopted the findings of the NYCCHR and issued plaintiff a second right-to-sue letter on the second charge. Dismissal and Notice of Rights as Ex. H.

On November 5, 2004 plaintiff filed the instant action based on the second right-to-sue letter issued by the EEOC on August 10, 2004. Complaint ¶ 12. Plaintiff alleges discrimination based on her national origin ("Guyanese"), race, age ("69"), color and disability ("knee problem and also a limp"). Complaint ¶¶ 7, 8. Plaintiff alleges that defendants terminated her employment, failed to accommodate her disability, and retaliated against her. Id. ¶ 4. After the parties completed discovery,

---

[2]Plaintiff states that the charge was filed on February 12, 2004. Complaint ¶ 10.

[3]Plaintiff states that the charge was filed on February 10, 2004. Complaint ¶ 9.

defendants filed the instant motion for summary judgment. Plaintiff opposes defendants' motion and defendants have filed a reply.

## DISCUSSION

### I.    STANDARD OF REVIEW

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Fed. R. Civ. P. 56(c). A fact is material if it is one that "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "An issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 202 (2d Cir. 2007) (quoting Anderson, 477 U.S. at 248); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). "The trial court's function in deciding such a motion is not to weigh the evidence or resolve issues of fact, but to decide instead whether, after resolving all ambiguities and drawing all inferences in favor of the non-moving party, a rational juror could find in favor of that party." Pinto v. Allstate Ins. Co., 221 F.3d 394, 398 (2d Cir. 2000); see also Baker v. The Home Depot , 445 F.3d 541, 543 (2d Cir. 2006) (resolving all ambiguities and drawing all inferences in favor of the nonmoving party on summary judgment). For the purposes of summary judgment, the facts here are viewed in the light most favorable to plaintiff.

"An adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); see Matsushita, 475 U.S. at 586-87 (1986). In other words, the non-moving party must

provide "affirmative evidence" from which a jury could return a verdict in its favor. Anderson, 477 U.S. at 257. "Conclusory allegations, conjecture, and speculation ... are insufficient to create a genuine issue of fact." Niagra Mohawk Power Corp. v. Jones Chemical, Inc., 315 F.3d 171, 175 (2d Cir. 2003) (quoting Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir. 1998)). Moreover, "[t]he 'mere existence of a scintilla of evidence' supporting the non-movant's case is also insufficient to defeat summary judgment." Id. (quoting Anderson, 477 U.S. at 252). "It is well established that the submissions of a *pro se* litigant must be construed liberally and interpreted 'to raise the strongest arguments that they suggest.'" Triestman v. Federal Bureau of Prisons, 470 F.3d 471, 474 (2d Cir. 2006) (quoting Burgos, 14 F.3d at 790).

## II.    TIMELINESS

To be timely, a plaintiff must file a federal lawsuit alleging discrimination within ninety days after receiving the right-to-sue letter from the EEOC. 42 U.S.C. § 2000e-5(f)(1); Sherlock v. Montefiore Medic. Ctr., 84 F.3d 522, 525 (2d Cir. 1996). Defendant moves to dismiss plaintiff's action as untimely. Here, plaintiff filed the instant suit on November 5, 2004, 135 days after the first right-to-sue letter, which the EEOC issued on June 23, 2004. Although plaintiff does not acknowledge receiving the first right-to-sue letter, her lawsuit would not be timely if based on the first right-to-sue letter.

Plaintiff's submissions suggest that she was confused by the dual processing of her case by both the EEOC and the NYCCHR. The allegations in plaintiff's charge giving rise to the August 10, 2004 right-to-sue letter from the EEOC are identical to the charge underlying the earlier, June 23, 2004 right-to-sue letter. However, plaintiff filed the instant action within ninety days of receiving the second right-to-sue letter from the EEOC on August 10, 2004. Therefore, as there is no evidence that

plaintiff purposefully filed a second EEOC charge to circumvent the filing deadlines, the Court should not dismiss plaintiff's action as time-barred. See Abidekun v. New York City Transit Auth., No. 93-CV-5600, 1998 U.S. Dist. LEXIS 8290 at *10 (E.D.N.Y. June 4, 1998)(holding that the ninety days to file an action began to run the day plaintiff received the second right-to-sue-letter, after plaintiff did not receive the original). Therefore, defendants' motion to dismiss plaintiff's action as untimely should be denied.

## III.  PLAINTIFF'S DISCRIMINATION CLAIMS AGAINST INDIVIDUALS

There is no individual liability under Title VII. Tomka v. Seiler Corp., 66 F.3d 1295, 1317 (2d Cir. 1995); See Mandell v. County of Suffolk, 316 F.3d 368, 377 (2d Cir. 2003) ("under Title VII, individual superiors are not subject to liability") . The definitions of "employer " in the Age Discrimination in Employment Act ("ADEA") and in the Americans with Disabilities Act ("ADA") mirror the definition in Title VII, 42 U.S.C. § 2000e(b). Federal courts generally employ the same analysis to claims under these three discrimination statutes. Courts in this jurisdiction consistently dismiss Title VII, ADA and ADEA claims asserted against individual defendants. Farulla v. New York School Const. Authority, 277 F. Supp. 2d 140, 143 (E.D.N.Y. 2003) (definition of "employer" same under Title VII and ADEA); See Mormol v. Costco Wholesale Corp., 364 F.3d 54, 59 (2d Cir. 2004)(no individual liability for employment discrimination claims under the Title VII). As plaintiff's claims against the individuals herein are only based on these three discrimination statutes, defendants' motion for summary judgment should be granted, and plaintiff's claims against Ashton, Iyanda and Nelson should be dismissed.

9

## IV. TITLE VII

Title VII of the of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) *et seq.*, prohibits an employer from discriminating against an employee on the basis of race, color, sex, religion, national origin, or retaliation. Burlington Northern & Santa Fe Railway Co. v. White, 548 U.S. 53, 56 (2006). A plaintiff bringing a Title VII action bears the burden of proving discrimination by a preponderance of the evidence. See St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506 (1993); Bickerstaff v. Vassar College, 196 F.3d 435, 446 (2d Cir. 1999), cert. denied, 530 U.S. 1242 (2000).

Employment discrimination claims are subject to the three-part burden-shifting analysis set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). To establish a *prima facie* case of discrimination, a plaintiff must show that (1) she is a member of a protected class; (2) she is qualified to perform the job or is performing her duties satisfactorily; (3) she suffered an adverse employment decision or action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discrimination based on her membership in the protected class. Farias v. Instructional Sys., Inc., 259 F.3d 91, 98 (2d Cir. 2001). A plaintiff's burden to establish a *prima facie* case of discrimination is *de minimis*. See Zimmerman v. Assocs. First Capital Corp., 251 F.3d 376, 381 (2d Cir. 2001).

If plaintiff succeeds in establishing a *prima facie* case, a presumption of discrimination arises and the burden shifts to the defendant to proffer a legitimate, nondiscriminatory reason for the adverse employment action. Farias, 259 F.3d at 98. Once defendant proffers such a reason, the presumption of discrimination created by the *prima facie* case drops out, and the defendant "will be entitled to summary judgment . . . unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination." James v. N.Y. Racing Ass'n, 233 F.3d 149, 154 (2d Cir.

2000).

In the third stage of the burden-shifting analysis, the plaintiff "must be afforded the opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 143 (2000). However, "[t]o allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all Title VII cases." Meiri v. Dacon, 759 F.2d 989, 997 (2d Cir. 1985). "In short, the question becomes whether the evidence, taken as a whole, supports a sufficient rational inference of discrimination." Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000).

### A. Plaintiff's *Prima Facie* Discrimination Claim

Plaintiff meets the first and third prongs of her *prima facie* case. Plaintiff is of Guyanese national origin, is over forty, and was terminated. Plaintiff also meets the fourth prong, that her termination occurred under circumstances giving rise to an inference of discrimination, because her position was filled by a younger woman of Chinese-Jamaican origin. See Farias, 259 F.3d 91 at 98 (the fourth prong of a *prima facie* case is satisfied if plaintiff demonstrates that her position was ultimately filled by person not a member of her protected class). However, it is less clear whether plaintiff satisfies the second prong, that she was qualified for the job or performed her job duties satisfactorily.

In order to show that she was qualified, plaintiff must show that she "was performing duties satisfactorily." McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997); See Bennett v. Watson Wyatt & Co., 136 F. Supp. 2d 236, 246 (S.D.N.Y. 2001) (plaintiff's lateness rendered him

unqualified as his ongoing problem with punctuality did not satisfy defendant's legitimate expectations of its employee). Here, defendants argue that plaintiff's chronic lateness, documented in memoranda and performance evaluations since 1996, demonstrate that plaintiff was not performing her job duties satisfactorily. However, at the *prima facie* stage, plaintiff need only establish "basic eligibility for the position at issue" by showing that he or she "possesses the basic skills necessary for the performance of [the] job." Slattery v. Swiss ReInsurance America Corp., 248 F.3d 87, 91 (2d Cir. 2001). This definition of "qualified for the job" comports with the *de minimis* burden placed on plaintiff at the *prima facie* stage of an employment discrimination case. Zimmerman, 251 F.3d at 381. The qualification prong "must not be interpreted in such a way as to shift into the plaintiff's *prima facie* case an obligation to anticipate or disprove the employer's proffer of a legitimate, non-discriminatory basis for its decision." Gregory v. Daly, 243 F.3d 687, 696 (2d Cir. 2001). To establish "qualification" the plaintiff "need not show perfect performance or even average performance." Id. (quoting Powell v. Syracuse Univ., 580 F.2d 1150, 1155 (2d Cir. 1978)). The plaintiff need only show "that she possesses the basic skills necessary for the performance of the job." Id. at 696 (quoting Owens v. New York City Housing Auth., 934 F. 2d 405, 409 (2d Cir. 1991)).

Here, plaintiff was qualified for the position and thus satisfies her *prima facie* case.

## B. Defendants' Legitimate Nondiscriminatory Reason for Plaintiff's Termination

As plaintiff establishes a *prima facie* case, a presumption of discrimination is created and the burden of production shifts to defendants to articulate a legitimate, nondiscriminatory reason for the adverse employment action. See McDonnell Douglas, 411 U.S. at 802-03. Defendants meet this burden here.

Defendants cite to plaintiff's habitual lateness to work as the legitimate, non-discriminatory

reason for plaintiff's termination. Despite numerous written warnings and conferences regarding her lateness to work, plaintiff did not improve, but rather, grew increasingly insubordinate. Ashton Aff. ¶ 21-22. Plaintiff's performance evaluations evidence a long-standing problem with punctuality, even prior to 2000 when she injured her knee. See, e.g., Performance Evaluations; Written Warning Re: Continued Late Arrival, November 13, 1996 attached to Defendants' Appendix of Exhibits as Exhibit K ("November Lateness Warning").

From 1999 to 2004, Nelson had several discussions with plaintiff about her rude behavior, lateness and refusal to follow instructions. Employee Conference Memoranda. Plaintiff's behavior did not improve and in fact deteriorated during this time, becoming "more disruptive and erratic after Ms. Nelson assumed the position of residence manager." Ashton Aff. ¶ 19. Iyanda, who joined Nelson in recommending plaintiff's termination to Ashton, repeatedly noted planitiff's tendency to raise her voice while discussing her failure to complete assignments and her chronic lateness. Ashton Aff. ¶ 20; Iyanda Final Warning. Plaintiff's performance evaluations steadily worsened over time. While all supervisors noted plaintiff's excellent receptionist skills, such as answering telephones and typing, they also noted plaintiff's chronic lateness to work as well as her late return from lunch breaks, and her insubordinate refusal to adapt to new procedures. See Performance Evaluations. In addition to comments plaintiff made about Nelson's age and qualifications, plaintiff would refuse to perform work that Nelson assigned to her, claiming that Nelson was not her boss or plaintiff would state, "that is not my job." Nelson Aff. ¶ 13.

Several incidents prompted Nelson to recommend plaintiff's termination. Nelson Aff. ¶ 15; See January Disciplinary Memos. Plaintiff had been late to work nineteen times in the previous two-month period despite many requests by Nelson that she report to work on time. Id. Plaintiff engaged

in a number of confrontations with co-workers, including one on January 13, 2004 where plaintiff had an argument with a co-worker because she was "annoyed at having to open the door for that individual." Nelson Aff. at ¶ 16. Nelson also observed plaintiff sleeping at her desk and returning late from lunch on January 13, 2004. Id. at ¶ 17. This was apparently the day that Nelson decided enough was enough. A meeting was held on February 10, 2004 to discuss plaintiff's termination. Plaintiff "refused to address the specific performance deficiencies at issue." Ashton Aff. ¶ 23. Moreover, plaintiff interrupted Ashton and raised her voice to allege that Nelson was responsible for all of plaintiff's problems at St. Vincent's and that Nelson had "set her up." Id. Plaintiff was terminated that day.

Plaintiff's nine-year history of chronic lateness, insubordinate attitude and failure to improve after numerous disciplinary warnings establishes a legitimate, non-discriminatory reason for defendant's action. The presumption of discrimination created by the *prima facie* case thus drops out and the burden to prove discrimination shifts back to plaintiff.

### C. Pretext

In order to defeat defendants' motion for summary judgment, plaintiff must demonstrate that defendants' reason for firing her was pretextual. See, e.g., Reeves, 530 U.S. 133, 143 (2000) (plaintiff retains the "ultimate burden of persuasion" of proving that discrimination, rather than the explanation offered by the employer, was the true reason for the adverse action). Plaintiff must also show that defendants' actions were motivated, at least in part, by discrimination. Fields v. New York State Office of Mental Retardation and Developmental Disabilities, 115 F.3d 116 (2d Cir. 1997). "For the case to continue, the plaintiff must then come forward with evidence that non-discriminatory reason the defendants proffered is a mere pretext for actual discrimination." Weinstock, 224 F.3d at 42.

14

It is plaintiff's burden to demonstrate that defendants' reasons are pretextual and that defendants were motivated, at least in part, by discrimination. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511 (1993); see also Viola v. Philips Med. Sys. of N. America, 42 F.3d 712, 717 (2d Cir. 1994) (to defeat a properly supported motion for summary judgment, plaintiff must "produce sufficient evidence to support a rational finding that the legitimate, nondiscriminatory reasons proffered by the employer were false, *and* that more likely than not, the employee's [protected class] was the real reason for the [adverse action].").

Here, plaintiff provides only conclusory allegations that defendants took the adverse action against her based on her age, disability, color or national origin. Plaintiff alleges

> [b]latant discrimination from the time I started working for St. Vincent's Services until the end of my working life there. (My color and being a Guyanese individual, with a disability (knee problems) and also a limp). The constant scrutiny made my life very unhappy there. The Manager, Ms. Allison Nelson, constantly made my working life difficult by writing me up almost every month or complaining to my Superiors about me on a regular basis...I had to use an <u>old</u> typewriter and the Manager took the computer (new) for herself, despite I was the Secretary.

Complaint ¶ 8 (emphasis in original). These allegations do not raise a genuine issue of material fact as to whether plaintiff's termination was motivated, even in part, by discrimination. Plaintiff makes conclusory statements regarding Nelson's "overly scrutinizing" behavior, alleging that plaintiff was disciplined because she was not of Jamaican origin. But plaintiff fails to support these allegations with any evidence. Pl. Opp. ¶ 3; Pl. Dep. at 81-83. Contrary to plaintiff's allegation, Nelson claims that plaintiff expressed a preference for using a word processor and typewriter instead of a computer, even after St. Vincent's sent plaintiff to a Microsoft Word training course. Nelson Aff. ¶ 25.

Plaintiff further claims that over the past four years about twenty secretarial staff members

have been terminated, none of whom were Jamaican. Complaint ¶ 8. Plaintiff alleges that if she were Jamaican she would not be terminated because Jamaican employees engaged in misconduct such as arriving to work late, laughing loudly, singing and using profanity, and were not reprimanded. Pl. Dep. at 64-68, 214-215. However, plaintiff fails to provide specific support for this assertion, and refused to reveal names of those Jamaican co-workers she claims had engaged in misconduct and had not been punished. Pl. Dep. at 280-282. Furthermore, while Ashton knew of many employees of various ages and racial backgrounds who had been disciplined for tardiness, no employee was late as frequently as plaintiff over such a long period of time. Ashton Aff. ¶ 15. When questioned about who plaintiff claimed was treated more favorably based on unlawful discrimination, plaintiff named one employee, Sandra Richards, who was of Jamaican origin and was also employed as a secretary. Pl. Dep. 278-280. Richards was warned by Nelson for her tardiness both verbally and in writing. Nelson Aff. ¶ 9; Richards Tardiness Warnings. However, Richards, unlike plaintiff, did not defy Nelson's warnings and improved her punctuality. Nelson Aff. ¶ 10. Therefore, plaintiff fails to demonstrate that Richards received more favorable treatment based on discrimination.

Plaintiff maintains that she was "not a favorite," and that other co-workers "singled me out" and "just didn't like me" to support her allegation that no other employee was reprimanded for tardiness. Pl. Dep. at 123-124. Moreover, plaintiff admitted that neither Nelson, nor any employee at St. Vincent's, ever made a derogatory comment about her national origin or a comment favoring Jamaican employees. Pl. Dep. at 166-168. From 1996 to 1999, plaintiff's job performance was appraised by supervisors Carmen Nurse, James Powers, Charles Iyanda and Barbara Rydel; these supervisors were not of Jamaican origin and all noted her chronic lateness. See Performance Evaluations. Iyanda, who is of Nigerian origin, repeatedly warned and counseled plaintiff on her lateness and insubordination. Ashton Aff. ¶ 20.

16

Plaintiff states that Nelson "would look at everything" plaintiff did and that Nelson "would trust her own more than she would trust me." Pl. Dep. at 81-82. In fact, plaintiff concedes that neither Nelson nor any other supervisor made derogatory remarks about her national origin, age, or race. Pl. Dep. at 91-92, 125-126, 166-167. While plaintiff mentions that St. Vincent's hired a younger secretary of Chinese and Jamaican origin to replace her, this alone does not demonstrate that plaintiff's termination was motivated by discrimination. See De La Cruz v. NYC Human Res. Admin., 82 F.3d 16, 22 (2d Cir. 1996) (it is not discrimination to replace a worker with a more qualified worker). Plaintiff also alleges, but provides no evidence, that Jamaican employees were frequently late and engaged in misconduct but were not terminated. Pl. Dep. at 275-277.

Throughout her deposition, plaintiff failed to provide specific facts to support her claims of discrimination, stating that she could not, or would not, recall the details. See, e.g. Pl. Dep. at 101, 114, 120, 122, 156-157, 194, 217, 251, 262-264. The sole example plaintiff provides to support her claim that she was treated differently than Jamaican employees because of her Guyanese national origin, color, age or race was that of Sandra Richards, a Jamaican secretary who arrived late to work. Pl. Dep. at 278-280. However, as noted, Richards, unlike plaintiff, did not disregard Nelson's warning and improved her punctuality. Nelson Aff. ¶ 10. Plaintiff points to no other facts to support her claim of discrimination.

### D. Plaintiff's Hostile Work Environment Claim

Although, plaintiff alleges that she was forced to work in an abusive environment and was subject to "constant scrutiny" by Nelson, plaintiff fails to establish that she was subject to a hostile work environment.

In order to establish a hostile work environment, a plaintiff must show that "the workplace

[was] permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993); Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir. 2000). Plaintiff fails to show that her co-workers' or supervisors' actions were discriminatory, severe, or pervasive. Plaintiff "must show not only that [she] subjectively perceived the environment to be abusive, but also that the environment was objectively hostile and abusive." Demoret v. Zegarelli, 451 F.3d 140, 149 (2d Cir. 2006). The Court looks at the totality of the circumstances of a hostile work environment claim, considering "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris, 510 U.S. at 23.

Plaintiff's characterization of Nelson's constant "scrutiny" as humiliating is not connected to discrimination in any way. See Scafidi v. Baldwin Union Free Sch. Dist., 295 F. Supp. 2d 235, 239 (E.D.N.Y. 2003) ("while close monitoring may cause an employee embarrassment or anxiety, such intangible consequences are not materially adverse alterations of employment conditions") (internal quotations omitted). Plaintiff describes how Nelson would ask her to call Father Morales about the heat and boiler problems and that placing these calls caused plaintiff embarrassment. Pl. Opp. at 2. In explaining how Nelson would ridicule her, plaintiff recounted an incident regarding a Christmas gift:

> Q: How did Ms. Nelson ridicule you, that's the word you used before? Did she ridicule you based on your injury?
> A: I notice Christmas two-oh-two, everybody got beautiful gifts.
> Q: From who?
> A: St. Vincent's. She was in charge of it. I got the worst gift. That thing hurt me. I realized it more so. I realize by giving me that gift, she only

endorsed.

Q: What did she give you?

A: She gave me a beer mug and four – a cheap-looking beer mug and four cheap glasses.

Q: What did other people get?

A: Oh, beautiful gifts.

Pl. Dep. at 127-128. This conduct does not demonstrate discrimination or a hostile work environment. Plaintiff's affront at being given a Christmas gift she did not like is more revealing of plaintiff's state of mind than it is of her employer. Furthermore, plaintiff's allegations of co-workers cursing, laughing and singing do not establish a hostile work environment. See Bickerstaff v. Vassar College, 354 F. Supp. 2d 276, 283 (S.D.N.Y. 2004) (no hostile work environment established when plaintiff's allegations do not include a single racial comment or personal insult, or a pattern of such comments).

In another incident, plaintiff claims that an African-American co-worker, Dwayne Smalls, bit her hand in the presence of Nelson because Nelson had told Smalls that plaintiff had touched his food. Pl. Dep. at 188-192. Despite Nelson denying that such an incident occurred, Nelson Aff. ¶ 26, this biting incident is the only specific instance that plaintiff alleges to establish a hostile work environment. Francis v. Chem. Banking Corp., 62 F. Supp. 2d 948, 959 (E.D.N.Y.1999) (dismissing hostile work environment claim where plaintiff only alleged four incidents). Although no one would condone an employee biting another employee, this incident does not establish a hostile work environment.

Plaintiff fails to adduce evidence of discrimination to raise a genuine issue of material fact. Therefore, defendants' motion for summary judgment should be granted and plaintiff's Title VII claims should all be dismissed.

19

## V.  PLAINTIFF'S AMERICANS WITH DISABILITIES ACT CLAIM

To establish a *prima facie* case of discriminatory termination under the ADA, a plaintiff must show that: (1) the employer is subject to the ADA; (2) she suffers from a disability within the meaning of the ADA; (3) she can perform the essential function of her job with or without a reasonable accomodation; and (4) she suffered an adverse employement action because of the disability. Ryan v. Grae & Rybicki, P.C., 135 F.3d 867, 869-70 (2d Cir. 1998); See also Giordano v. City of New York, 274 F.3d 740, 754 (2d Cir. 2002).  Plaintiff does not demonstrate that she suffers from a disability within the meaning of the ADA, nor can she demonstrate that she suffered an adverse employment action because of her alleged disability.

In Bragdon v. Abbott, 524 U.S. 624 (1998), the Supreme Court articulated the test for evaluating a plaintiff's disability. The ADA defines disability as: (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment. 42 U.S.C. § 12102(2).  To determine whether plaintiff's disability claim is covered by the ADA, courts begin with subsection (A) and focus first on whether plaintiff suffers from an impairment, whether the impairment affects a "major life activity" under the ADA and finally, whether plaintiff is substantially limited in the identified major life activity.  Regional Economic Community Action Program, Inc. v. City of Middletown, 294 F.3d 35, 46 (2d Cir. 2002); Colwell v. Suffolk County Police Dep't., 158 F.3d 635, 641 (2d Cir. 1998).

Plaintiff describes her disability as "knee problems and also a limp." Complaint ¶ 8. Nowhere in her complaint or opposition does she provide evidence of her knee problems or limp as impairing her ability to work or engage in any major life activity. Nor does plaintiff provide any record, medical

or otherwise, of such an impairment. At her deposition, plaintiff testified that she suffered a torn meniscus in her knee as a result of a bus accident in August 2000. Pl. Dep. at 117-119. Plaintiff mentioned but refused to comment on a second bus accident involving her knee which also caused her a "lot of pain and suffering for years." Id. at 118-120. Plaintiff fails to establish that she is disabled within any definition under the ADA or that her disability interfered with the performance of her secretarial duties. See Garvin v. Potter, 367 F.Supp.2d 548, 562 (S.D.N.Y.2005) (where postal worker's inability to walk quickly or to walk more than eight hours per day was insufficient to give rise to a question of fact as to the existence of a disability).

While plaintiff admitted that Nelson did not say anything to her about her injury or limp, plaintiff alleges that Nelson once walked with a limp to purposefully mock plaintiff. Pl. Dep. at 129-131. Plaintiff testified:

> Q: You believe that because she was limping and because
> she laughed while she was limping, that she was ridiculing you?
> A: She do [sic] that to hurt me.
> Q: Did you say anything to her?
> A: She is a young, inexperienced woman.
> Q: Did you say anything to her?
> A: I laughed too. What else can I do?

Id. Nelson denies that she ever mocked plaintiff's limp. Nelson Aff. ¶ 21. However, even assuming Nelson did so, this alone is insufficient to establish disability discrimination. Plaintiff alleges nothing else to support her claim of discrimination based on her disability. Pl. Dep. at 131. Plaintiff also blames her chronic lateness to work on her knee injury, claiming that she could not "move fast" in the morning and that the knee injury "bolstered" the fact that Jamaican employees and Nelson did not like her. Pl. Dep. at 123. Plaintiff admits, however, that she was reprimanded for her late arrival to

21

work and returning from breaks even before she had her knee injury in 2000. Id. 124-125. These facts undermine plaintiff's claim of disability discrimination.

Providing an employer with notice of a claimed disability is also an essential element of a wrongful termination case under the ADA. Raytheon v. Hernandez, 540 U.S. 44, 55 n. 7 (2003) (adverse employment action cannot be based on disability discrimination if employer was unaware of the plaintiff's disability); See Woodman v. WWOR-TV, Inc., 411 F.3d 69, 81 (2d Cir.2005); Watson v. Arts & Entertainment Television Network, No. 04 Civ.1932, 2008 WL 793596 at *10, (S.D.N.Y. March 26, 2008). Plaintiff admits that she never told any supervisor about her knee problem, or mentioned her "disability" during the termination meeting. Pl. Dep. at 131; Nelson Aff. ¶ 21. Thus, plaintiff fails to establish a *prima facie* case of disability discrimination and defendants' motion for summary judgment should be granted.


## VI.    PLAINTIFF'S AGE DISCRIMINATION IN EMPLOYMENT CLAIM

Age discrimination claims under the ADEA are also analyzed under the McDonnell Douglas framework. See Kessler v. Westchester County Dep't Social Services, 461 F.3d 199 (2d Cir. 2006) (same treatment under the ADEA as under Title VII). Plaintiff has the burden at the outset of "proving by the preponderance of the evidence a *prima facie* case of discrimination." Texas Department of Community Affairs v. Burdine, 450 U.S. 248 (1981); Feingold v. New York, 366 F.3d 138, 152 (2d Cir. 2004).

There is no dispute that plaintiff satisfies elements one and three of her *prima facie* case: plaintiff is over forty years old and she was terminated. The Court also finds that plaintiff was qualified for the position. However, plaintiff has not satisfied the fourth element, namely that she was terminated

under circumstances giving rise to an inference of discrimination based on her age.

Plaintiff fails to cite any evidence demonstrating that age was a factor in her termination and concedes that defendants never commented on her age during her employment. Pl. Dep. at 91-92. Her only basis for her age discrimination claim is that Nelson, the residence manager, was younger than her. In response to being questioned about why she believed her age to be a basis for her termination, plaintiff replied "Allison [Nelson] is a 30-year-old woman. She likes to giggle a lot. She is not a serious girl, very immature for her age and – I think she was very immature. I think that she didn't want me around." Pl. Dep. at 85. Plaintiff believed Nelson had learned of her age from a job application, which plaintiff had left in the copy machine around the year 2000. Id. at 85-89. Nelson denies knowing or ever commenting about plaintiff's age. Nelson Aff. ¶ 12.

Plaintiff also alleges that Nelson would only hire young people yet admits that there were "one or two people" in the same age group as plaintiff who were allegedly hired by Nelson. Pl. Dep. at 85-89, 97. Nelson avers that she did not have authority to make decisions regarding hiring or firing. Nelson Aff. ¶ 5; Ashton Aff.¶ 21. However, at the time of plaintiff's termination, sixteen of the twenty-three employees at the Williamsburg ICF of St. Vincent's were over the age of forty. See Roster of Williamsburg ICF Employees attached to Defendants' Appendix of Exhibits as Exhibit I. The Court finds that plaintiff fails to meet the *de minimis* burden to establish a *prima facie* case of age discrimination. Therefore, defendant's motion for summary judgement should be granted.

## VII.    PLAINTIFF'S RETALIATION CLAIM

To establish a *prima facie* case of retaliation under Title VII, plaintiff must show that: (a) she engaged in a protected activity, (b) the employer was aware of that activity, (c) the employee suffered an adverse employment action, and (d) a causal connection existed between the protected activity and the adverse employment action. Kessler v. Westchester County Dep't Social Servs., 461 F.3d 199,

205 (2d Cir. 2006). Plaintiff fails to establish a *prima facie* case of retaliation under Title VII.

Here, plaintiff fails to demonstrate that she engaged in any protected activity before her termination on February 10, 2004. Plaintiff first filed her charge of discrimination with the EEOC on February 17, 2004 and then with the NYCCHR on April 27, 2004. Because the adverse action plaintiff complains of, her termination, preceded her filing of the EEOC and NYCCHR charges, plaintiff fails to establish a *prima facie* case of retaliation and defendants' motion for summary judgment should be granted

.

## CONCLUSION

Accordingly, defendants' motion for summary judgment should be granted and plaintiff's complaint should be dismissed.

## FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Report to file written objections. See also Fed. R. Civ. P. 6. Such objections (and any responses to objections) shall be filed with the Clerk of Court. Any request for an extension of time to file objections must be made within the ten-day period. Failure to file a timely objection to this Report generally waives any further judicial review. Marcella v. Capital District Physicians' Health Plan, Inc., 293 F.3d 42 (2d Cir. 2002); Small v. Secretary of Health and Human Services, 892 F.2d 15 (2d Cir. 1989); see Thomas v. Arn, 474 U.S. 140 (1985).

SO ORDERED.

/S/
LOIS BLOOM
United States Magistrate Judge

Dated: December 5, 2008
Brooklyn, New York